## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No. //cr /04//6 DJC |
|  | ) |
|  | ) VIOLATIONS: |
| v. | ) 18 U.S.C. § 1349 (Conspiracy to |
|  | ) Commit Securities Fraud) |
| (1) KELLY BLACK-WHITE | ) 18 U.S.C. §§ 1343, 1349, 2 (Wire Fraud) |
| (2) ALBERT REDA | ) 18 U.S.C. §§ 1341, 1349, 2 (Mail Fraud) |
| (3) STEPHEN STUART | ) 18 U.S.C. § 981 (Criminal Forfeiture) |
|  | ) 28 U.S.C. § 2461(Criminal Forfeiture) |
|  | ) |
|  | ) |

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

1.     At all times material to this Indictment, defendant, KELLY BLACK-WHITE, was a resident of Arizona.

2.     At all times material to this Indictment, BLACK-WHITE operated Premier Funding & Financial Marketing, LLC, Premier Media Services, Inc. and a web site entitled hotchicksstockpicks.com through which she promoted penny stocks and assisted public companies in finding sources of funding.

3.     At all times material to this Indictment, BLACK-WHITE served as a member of the Board of Directors of Symbollon Pharmaceuticals, Inc. ("Symbollon"), a Delaware corporation that was in the business of developing and marketing pharmaceuticals. Symbollon's common stock was publicly quoted on OTC Markets, Inc. ("OTC"), an inter-dealer electronic quotation and trading system in the over-the-counter securities market. Symbollon was an issuer of stock with a class of securities registered under Section 12 of the Securities Exchange Act of 1934.

4.    At all times material to this Indictment, defendant, ALBERT REDA, was a resident of California.

5.    At all times material to this Indictment, 1ˢᵗ Global Financial, Inc ("1ˢᵗ Global") was a real estate company incorporated in Nevada. REDA was Treasurer and a member of the Board of Directors of 1ˢᵗ Global.

6.    At all times material to this Indictment, 1ˢᵗ Global's common stock was publicly quoted on OTC.

7.    At all times material to this Indictment, defendant, STEPHEN STUART, was a resident of Maryland.

8.    At all times material to this Indictment, ComCam International, Inc. ("ComCam") was a Delaware corporation in the business of developing and manufacturing surveillance equipment. STUART was a consultant to, and shareholder of, ComCam.

9.    At all times material to this Indictment, ComCam's common stock was publicly quoted on OTC.

10.   At all times material to this Indictment, "UA" was an undercover agent of the Federal Bureau of Investigation (the "FBI") who purported to be a representative of a major investment fund (the "Fund"). In actuality, and unbeknownst to BLACK-WHITE, REDA and STUART, the Fund never existed, except as part of an ongoing FBI undercover operation.

## THE FRAUD

11.   As set forth below, beginning in or about May 2011 and continuing through at least July 2011, BLACK-WHITE engaged in, attempted to engage in, and conspired to engage in a scheme to defraud and to obtain money and property by means of materially false and fraudulent

2

pretenses, representations and promises, by agreeing to introduce executives of public companies to UA so they could enter into the funding/kickback arrangement described below.

12.     As set forth below, beginning in or about June 2011 and continuing through at least July 2011, REDA engaged in, attempted to engage in, and conspired to engage in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, by secretly kicking back to UA fifty percent of Fund monies invested in 1st Global.

13.     As set forth below, beginning in or about June 2011 and continuing through at least August 2011, STUART engaged in, attempted to engage in, and conspired to engage in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, by secretly kicking back to UA fifty percent of Fund monies invested in ComCam.

3

## MANNER AND MEANS OF THE FRAUD

### *BLACK-WHITE'S AGREEMENT TO INTRODUCE EXECUTIVES TO UA IN EXCHANGE FOR A PORTION OF THE KICKBACK MONIES*

14.    At some time prior to June 13, 2011, E.H. told BLACK-WHITE that UA was willing to invest Fund money in companies in exchange for a fifty percent kickback that would go to UA.

15.    On or about June 13, 2011, BLACK-WHITE met with UA (the "June 13 BLACK-WHITE Meeting"). At the June 13 BLACK-WHITE Meeting, UA offered to pay BLACK-WHITE a fee for introducing UA to executives of publicly traded companies who would agree to pay a kickback to UA in exchange for investing the Fund's money in their companies, enabling UA to pocket half of the money he was supposedly investing on behalf of the Fund.

16.    In particular, BLACK-WHITE was told that UA was prepared to invest up to $5 million of the Fund's money in various publicly traded companies, provided those companies secretly kicked back fifty percent of those funds (*i.e.*, $2,500,000.00) to UA. BLACK-WHITE was informed that the Fund was not to be informed of the kicked back payments.

17.    BLACK-WHITE was told that if the Fund purchased $5 million of stock all at once, the transaction might attract attention at the Fund. In order to avoid detection, therefore, UA said that he would invest the Fund's money gradually, in tranches (or installments) that would increase in size over time.

18.    As a further means of concealing the nature of the transactions, BLACK-WHITE was told that the kickback payments would be made to one or more "nominee" consulting companies that

4

UA purportedly controlled and which the Fund did not know about. BLACK-WHITE also was told that invoices would be issued by UA's "nominee company" in order to disguise the kickbacks.

19.     BLACK-WHITE agreed that UA would pay BLACK-WHITE approximately ten percent of the kickbacks paid by any executive whom BLACK-WHITE introduced to UA.

20.     Prior to the June 13 BLACK-WHITE Meeting, BLACK-WHITE had referred executives from at least two publicly traded companies, Symbollon and MicroHoldings, Inc., to UA so that those executives could enter into a funding/kickback agreement with UA.

21.     After the June 13 BLACK-WHITE Meeting, BLACK-WHITE referred the following individuals and companies to UA so that they could enter into a funding/kickback arrangement with UA: REDA, and his company 1st Global; STUART and his company, ComCam; and executives from Oriens Travel & Hotel Management, Inc. and A5 Laboratories, Inc.

22.     Each of the executives whom BLACK-WHITE referred to UA agreed to, and did, pay a kickback to UA in exchange for UA causing the Fund to invest in their respective companies. In connection with the investments, each of the executives also caused stock certificates to be issued representing the purchase by the Fund of shares in their respective companies.

23.     The investments in the companies that BLACK-WHITE referred to UA were made by wire transfers from a bank account maintained in Boston, Massachusetts. The kickback payments from the various companies BLACK-WHITE referred to UA were made by wire transfers from the various companies to Citizens Bank account number ******0517, which was held in the name of one of UA's "nominee companies" in Massachusetts.

24.     Based on her agreement with UA, on various dates between June 22, 2011 and July 5, 2011, BLACK-WHITE received a portion of the kickbacks paid by executives she had referred

5

to UA. BLACK-WHITE's shares of the kickbacks were paid by wire transfer from Citizens Bank account number \*\*\*\*\*\*0517, which was held by one of UA's "nominee companies" in Massachusetts to JP Morgan Chase account number \*\*\*\*\*\*\*\*\*\*\*\*6930, a bank account held by Premier Funding & Financial Marketing, LLC and controlled by BLACK-WHITE.

*BLACK-WHITE INTRODUCES UA TO REDA WHO AGREES TO PROVIDE A SECRET KICKBACK TO UA IN EXCHANGE FOR FUND INVESTMENT*

25.     Some time prior to June 29, 2011, BLACK-WHITE arranged for REDA to meet with UA to discuss funding for 1st Global.

26.     On or about June 29, 2011, REDA met with UA (the "June 29 REDA Meeting"). UA explained to REDA that he was prepared to invest Fund monies of up to $5 million in 1st Global, in exchange for a secret fifty percent kickback to UA, enabling UA to pocket half of the money he was supposedly investing on behalf of the Fund.

27.     At the June 29 REDA Meeting, UA also explained the mechanics of the funding, informing REDA that while UA could commit to an investment of $5 million of the Fund's money, with $2.5 million being kicked back to UA, UA did not want to invest the entire amount at once. Therefore, UA told REDA he would invest the money over time in tranches, or installments, of increasing amounts.

28.     At the June 29 REDA Meeting, UA further discussed with REDA the mechanics of how monies would be kicked back to UA. UA arranged with REDA that REDA's company would execute a consulting agreement with a "nominee" consulting company that UA purportedly controlled, but that UA would not actually provide any consulting services. REDA was told that invoices would be issued by UA's nominee company to 1st Global in order to disguise the kickbacks.

6

29.    At the June 29 REDA Meeting, REDA agreed to the funding/kickback arrangement.

30.    On various dates between June 30, 2011 and July 8, 2011, REDA sent UA documents related to the kickback transaction, including a consulting agreement between 1st Global and UA's nominee consulting company and stock purchase agreements between 1st Global and the Fund.

31.    On or about July 5, 2011, in accordance with wiring instructions provided by REDA, $32,000 was sent by wire transfer from a bank account maintained in Boston, Massachusetts, purportedly belonging to the Fund, to a 1st Global corporate bank account outside of Massachusetts. This wire transfer represented the first tranche of funding to 1st Global.

32.    On or about July 5, 2011, REDA caused a stock certificate representing the purchase by the Fund of 1st Global shares to be sent to UA by Federal Express.

33.    On or about July 6, 2011, REDA caused a total of $16,000 to be sent by wire transfer from a 1st Global corporate bank account outside of Massachusetts to Citizens Bank account number ******0517, which was held in the name of UA's "nominee company" in Massachusetts. This wire transfer represented REDA's kickback to UA from the first tranche of funding to 1st Global.

## *BLACK-WHITE INTRODUCES UA TO STUART WHO AGREES TO PROVIDE A SECRET KICKBACK TO UA IN EXCHANGE FOR FUND INVESTMENT*

34.     At some time prior to June 29, 2011, BLACK-WHITE arranged for STUART and D.G., the Chief Executive Officer of ComCam, to meet with UA to discuss funding for ComCam.

35.     On or about June 29, 2011, STUART and D.G. met with UA (the "June 29 STUART Meeting"). UA explained to STUART and D.G. that he was prepared to invest Fund monies of up to $5 million in ComCam, in exchange for a secret fifty percent kickback to UA, enabling UA to pocket fully half of the money he was supposedly investing on behalf of the Fund.

36.     At the June 29 STUART Meeting, UA also explained the mechanics of the funding, informing STUART and D.G. that while UA could commit to an investment of $5 million of the Fund's money, with $2.5 million being kicked back to UA, UA did not want to invest the entire amount at once. Therefore, UA told STUART and D.G. that he would invest the money over time in tranches, or installments, of increasing amounts.

37.     At the June 29 STUART Meeting, UA further discussed with STUART and D.G. the mechanics of how monies would be kicked back to UA. UA arranged with STUART and D.G. that STUART's and D.G.'s company would execute a consulting agreement with a "nominee" consulting company that UA purportedly controlled, but that UA would not actually provide any consulting services. STUART and D.G. were told that invoices would be issued by UA's nominee company to ComCam in order to disguise the kickbacks.

38.     At the June 29 STUART Meeting, STUART and D.G. agreed to the funding/kickback arrangement.

8

39.     On various dates between June 30, 2011 and July 8, 2011, D.G. sent UA documents related to the kickback transaction, including a consulting agreement between ComCam and UA's nominee consulting company and stock purchase agreements between ComCam and the Fund.

40.     On or about July 5, 2011, in accordance with wiring instructions provided by D.G., $34,000.20 was sent by wire transfer from a bank account maintained in Boston, Massachusetts, purportedly belonging to the Fund, to a ComCam corporate bank account outside of Massachusetts. This wire transfer represented the first tranche of funding to ComCam.

41.     On or about July 8, 2011, STUART and D.G. caused a stock certificate representing the purchase by the Fund of ComCam shares to be sent to UA by Federal Express.

42.     On or about July 6, 2011, STUART and D.G. caused a total of $17,000 to be sent by wire transfer from a ComCam corporate bank account outside of Massachusetts to Citizens Bank account number ******0517, which was held in the name of UA's "nominee company" in Massachusetts. This wire transfer represented STUART's and D.G.'s kickback to UA from the first tranche of funding to ComCam.

9

## COUNT ONE
### (18 U.S.C. § 1349 – Conspiracy to Commit Securities Fraud)

43.     Paragraphs 1-42 are re-alleged and incorporated by reference as though fully set forth herein.

44.     From in or about May 6, 2011 through no earlier than July 8, 2011, in the District of Massachusetts and elsewhere, the defendant,

### (1) KELLY BLACK-WHITE,

together with others known and unknown to the Grand Jury, conspired and attempted to knowingly execute a scheme and artifice (a) to defraud persons in connection with the securities of an issuer with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934, to wit, Symbollon Pharmaceuticals, Inc., and (b) to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, to wit, Symbollon Pharmaceuticals, Inc.

All in violation of Title 18, United States Code, Sections 1348, 1349 and 2.

10

## COUNTS TWO THROUGH TEN
### (18 U.S.C. § 1343 - Wire Fraud)

45.     Paragraphs 1-42 are re-alleged and incorporated by reference as though fully set forth
herein.

46.     On or about the dates set forth below, in the District of Massachusetts and elsewhere,
the defendant,

### (1) KELLY BLACK-WHITE,

having devised and intending to devise a scheme and artifice to defraud and to obtain money and
property by means of materially false and fraudulent pretenses, representations and promises, for the
purpose of executing such scheme and artifice, transmitted and caused to be transmitted in interstate
commerce, wire communications, including writings, signals, and sounds, and attempted and
conspired to do so, which interstate wire communications included wire transfers and associated on-
line notices, instructions and inquiries regarding the transfer of funds into and out of a bank account
in the name of one of UA's "nominee companies" in Massachusetts, as follows:

| Count | Date | Wire Transmission |
|---|---|---|
| 2 | 5/10/11 | $9,000 wire transfer from Symbollon Pharmaceuticals, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |
| 3 | 5/24/11 | $15,000 wire transfer from Symbollon Pharmaceuticals, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |
| 4 | 6/10/11 | $30,000 wire transfer from Symbollon Pharmaceuticals, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |
| 5 | 5/24/11 | $9,000 wire transfer from MicroHoldings, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |

11

| 6 | 6/10/11 | $15,000 transferred by wire from MicroHoldings, Inc. and the Racer's Edge, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |
| 7 | 6/28/11 | $7,500 wire transfer from A5 Laboratories, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |
| 8 | 6/27/11 | $8,000 wire transfer from Oriens Travel & Hotel Management, Inc. to Citizens Bank account no. ******0517 in Boston Massachusetts |
| 9 | 6/22/11 | $4,500 wire transfer from Citizens Bank account no. ******0517 in Boston Massachusetts to JP Morgan Chase account number ************6930, a bank account held by Premier Funding & Financial Marketing, LLC and controlled by BLACK-WHITE |
| 10 | 7/5/11 | $1,550 wire transfer from Citizens Bank account no. ******0517 in Boston Massachusetts to JP Morgan Chase account number ************6930, a bank account held by Premier Funding & Financial Marketing, LLC and controlled by BLACK-WHITE |

All in violation of Title 18, United States Code, Sections 1343, 1349 and 2.

## COUNT ELEVEN
### (18 U.S.C. § 1343 - Wire Fraud)

47.    Paragraphs 1-42 are re-alleged and incorporated by reference as though fully set forth

herein.

48.    On or about the date set forth below, in the District of Massachusetts and elsewhere,

the defendants,

### (1) KELLY BLACK-WHITE, and
### (2) ALBERT REDA

having devised and intending to devise a scheme and artifice to defraud and to obtain money and

property by means of materially false and fraudulent pretenses, representations and promises, for the

purpose of executing such scheme and artifice, transmitted and caused to be transmitted in interstate

commerce, wire communications, including writings, signals, and sounds, and attempted and

conspired to do so, which interstate wire communications included wire transfers and associated on-

line notices, instructions and inquiries regarding the transfer of funds into and out of a bank account

in the name of one of UA's "nominee companies" in Massachusetts, as follows:

| Count | Date | Wire Transmission |
|-------|------|-------------------|
| 11 | 7/6/11 | $16,000 wire transfer from 1st Global Financial, Inc. to Citizens Bank account no. ******0517 in Boston, Massachusetts |

All in violation of Title 18, United States Code, Sections 1343, 1349 and 2.

13

## COUNT TWELVE
## (18 U.S.C. §§ 1341, 1349, 2 - Mail Fraud)

49.     Paragraphs 1-42 are re-alleged and incorporated by reference as though fully set forth herein.

50.     On or about July 5, 2011, in the District of Massachusetts and elsewhere, the defendant,

### (2) ALBERT REDA

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice did knowingly cause matter and things to be delivered by the United States Postal Service and private and commercial interstate carriers, and attempted and conspired to do so, namely, the mailing of a stock certificate representing the purchase by the Fund of 320,000 shares of 1st Global Financial, Inc.

All in violation of Title 18, United States Code, Sections 1341, 1349 and 2.

14

## COUNT THIRTEEN
## (18 U.S.C. § 1343 - Wire Fraud)

51.     Paragraphs 1-42 are re-alleged and incorporated by reference as though fully set

forth herein.

52.     On or about the date set forth below, in the District of Massachusetts and

elsewhere, the defendants,

> (1) KELLY BLACK-WHITE, and
> (3) STEPHEN STUART

having devised and intending to devise a scheme and artifice to defraud and to obtain money and

property by means of materially false and fraudulent pretenses, representations and promises, for

the purpose of executing such scheme and artifice, transmitted and caused to be transmitted in

interstate commerce, wire communications, including writings, signals, and sounds, and

attempted and conspired to do so, which interstate wire communications included wire transfers

and associated on-line notices, instructions and inquiries regarding the transfer of funds into and

out of a bank account in the name of one of UA's "nominee companies" in Massachusetts, as

follows:

| Count | Date | Wire Transmission |
|-------|------|-------------------|
| 13 | 7/6/11 | $17,000 wire transfer from ComCam International, Inc. to Citizens Bank account no. ******0517 in Boston, Massachusetts |

All in violation of Title 18, United States Code, Sections 1343, 1349 and 2.

15

## COUNT FOURTEEN
## (18 U.S.C. §§ 1341, 1349, 2 - Mail Fraud)

53.    Paragraphs 1-42 are re-alleged and incorporated by reference as though fully set forth herein.

54.    On or about July 8, 2011, in the District of Massachusetts and elsewhere, the defendant,

### (3) STEPHEN STUART

having devised and intending to devise a scheme and artifice to defraud and to obtain money and

property by means of materially false and fraudulent pretenses, representations and promises, for

the purpose of executing such scheme and artifice did knowingly cause matter and things to be

delivered by the United States Postal Service and private and commercial interstate carriers, and

attempted and conspired to do so, namely, the mailing of a stock certificate representing the

purchase by the Fund of 65,385 shares of ComCam International, Inc.

All in violation of Title 18, United States Code, Sections 1341, 1349 and 2.

16

## FORFEITURE ALLEGATION
### 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461

The Grand Jury further charges that:

55.     Upon conviction of one or more of the offenses alleged in Counts One through

Fifteen of the Indictment, the defendants,

> (1) KELLY BLACK-WHITE,
> (2) ALBERT REDA, and
> (3) STEPHEN STUART,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c),

any property, real or personal, which constitutes or is derived from proceeds traceable to such

violations.

56.     If any of the property described in paragraph 55, above, as a result of any act or

omission of the defendants:

> a.     cannot be located upon the exercise of due diligence;
>
> b.     has been transferred or sold to, or deposited with, a third party;
>
> c.     has been placed beyond the jurisdiction of the Court;
>
> d.     has been substantially diminished in value; or
>
> e.     has been commingled with other property which cannot be subdivided
>         without difficulty;

17

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in subparagraphs (a) through (e).

All in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States, Section 2461(c).

A TRUE BILL

FOREPERSON OF THE GRAND JURY

SARAH E. WALTERS
VASSILI THOMADAKIS
ASSISTANT U.S. ATTORNEYS

DISTRICT OF MASSACHUSETTS; January _11_, 2012

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

a) 2:20P/4
1/11/12

19